Good morning everyone, our first matter is In Re Discovery Labs, and before we begin I just one more time want to thank Judge Wallace Tashima, who's kindly consented to sit with us this week from the 9th Circuit Court of Appeals, and we appreciate your service and thank you. Thank you. Good morning, Your Honor, and may it please the Court. My name is James Malone and I speak for the plaintiffs this morning. I'd like to reserve two minutes of my allotted time for purposes of rebuttal, if that's satisfactory. I would submit that while this is a case that involves a complex and regulated industry, at the end of the day it's going to turn on four words. The four words are identity, strength, purity, and quality. Those four words are drawn from the Food, Drug, and Cosmetic Act. One of the factors the FDA is required to assess in determining whether to grant approval to a new drug application is whether the manufacturing process in place will guarantee the identity, strength, quality, and purity of the drug. The end of the story of this case, however, in a different setting. The end of when Erin McCaffrey, an FDA inspector, wrote them on a form 483 that she prepared summarizing her observations of an inspection she conducted at Discovery Labs facility in Totaliton, New Jersey. Can we agree that before the 483 there's really nothing that's actionable there, or do you disagree with that? I strongly disagree with that, Your Honor. Okay. And the reason I disagree is this. What the 483, I think, puts clearly into context is that there was an inconsistency between the manufacturing process that this company had used to prepare its phase three clinical batches and the manufacturing process that was on the ground at Totaliton, New Jersey. Given the structure of the relationship- And you're saying that's because they didn't assign everything to sell everything to Laureate that Akron was using? They did not effectuate an appropriate technical transfer. That's what Ms. McCaffrey tells us in our report. And I think if you follow through the sequence of events after that, her report comes out, you'll see that that's true. Before I walk through this, because there are a number of statements, a number of different phases, both before the 483 and then the approvable letter, and some statements made between there and some statements made after. And in terms of the scienter, because as you know, this area has become almost like the old pleading requirements in terms of, you make a misstep and you're out of court. It's become incredibly treacherous for attorneys and shareholders who are trying to realize on their investment. So if you don't mind, sir, before the 483, what are the statements that you're saying are actionable and where's the allegation of scienter in the complaint? The focus, we've broken this case down into three segments and relating to the 483, there really are two. In the period from the beginning of the class period in March of 2004, up until they advised people to form 483, the company is making a series of statements that say, in words or in substance, all steps required for production of CGMP compliant material. Now that's an acronym that means compliant with current good manufacturing practices. The FDA's structure that says, manufacture in a way that assures identity, strength, purity, quality. We think those are actionable because we think that the defendants are chargeable with knowledge of the differences between the production process that they had in place with ACORN and the production process that they had put in place into TOW in New Jersey with this new contract manufacturer. When you say they're chargeable with knowledge, the cases you rely on are cases having to do with a cancer problem or very extreme situations where you could say they're chargeable with knowledge or you could impute knowledge to them. Here you have a very different situation. It has to do with a process and how different something was. There's no big red flags. I guess I'm asking, what's your best case that says this is the type of situation where you can charge them with knowledge? I think the best case for us is actually ADVANA and it's not because of what ADVANA holds but it's because of what ADVANA doesn't hold. This court in ADVANA very carefully said you can't hold a top corporate officer to be responsible and chargeable with knowledge just because they're the CEO or just because they're the CFO. But it then took great pains to distinguish a single case. It distinguished a case called Anchor Communications out of the District of Minnesota. And what did that involve? It distinguished a case that involved the company's single largest contractor. And that's what we have here. We have a one drug company. We have a company that's trying to get its product on the market. We have defendants that have advanced degrees. And we have defendants that control all the process of how this drug is going to be made. But what's failing here is such that it should have been the red flag and it should have been known? What's specific? You have a lot of little things but what's the key that would make us say, ah, they definitely are chargeable with knowledge? Well, there's one adverse event that occurs before the class period starts, which is there is a stability batch that's manufactured in November of 03. That's shortly after they set up this process. That's with Acorn, though, isn't it? Or is that after Acorn? No, no, no. That's at Tatawa. That's with this company, Lauria. That's the very beginning. That's the beginning of the process. That batch is not investigated until February of 04. There's an overage in the active ingredient of that batch. Shortly after that batch is investigated, we see the defendants execute a series of transactions in which they start to sell large blocks of their shares. And understand something about the structure of this contract. They had the power and they had the authority to approve all the procedures that were in place with Tatawa. The contract they had with Lauria gave them that. They approved the product specifications. They approved the form of the batch records. After they sold the shares, didn't there come a time when they started buying shares? They bought a modest number of shares, Your Honor, which we've given you the PR Diamonds case and a couple other cases. They made millions of dollars in what they sold. They bought a few thousand shares. So the comparison between the two, it really pales in comparison. But what's interesting, you had mentioned the approvable letter. And the approvable letter, I think, will help tie this together. Because what we're told, we get on the first approvable letter, they announced it on Valentine's Day in 2005. We're told that that involves the manufacturing problems that they've alluded to and it involves labeling. They prepare a response, which they announced in July of 2005. And then what happens next is that on August the 15th, they're told the response is insufficient. And on August the 19th, they're told, we learn that they have written comments back from the FDA. What's the FDA asking about? The FDA is asking about the chemistry, manufacturing, and control section of the New Drug application. That's the section that involves the product specifications. That's the section that involves the specifications that discovered that was approved. But they didn't disclose, didn't they, in their conference call, in their press release, didn't they? They spun it. But they did disclose the problems they're having with the FDA, didn't they? Well, I have a problem with the idea that you have a report from an FDA inspector that says you have failed to make a technical transfer of your manufacturing process to assure that the process you're using now is consistent with what you used in your phase three clinical trials. And then someone saying, in response to that, or disclosing that, saying there are no fundamental flaws with the manufacturing process. I think there's a disconnect there. I think that's problematic. But they did disclose there that they might not get an approvable letter, didn't they? That's true. And then they did get the approvable letter. That is also true. But there are degrees and gradations of risk. And different people might look at the fact circumstances differently and make their own assessment of what this company's prospects were, and that would affect the price. It's the difference between a pothole and a crevasse, perhaps. I mean, it's long been recognized that just because you make a warning, if it isn't specific enough, if it doesn't address the specific risk that you're dealing with, here, a shift in the manufacturing process, then that may not be sufficient. But you still have to tie that together with an allegation of scienter, which is grounded in some factual basis, to get you to the point where you're making a good faith argument that this is not just a smoking gun, but they knew there was smoke coming out of the barrel, or they knew there was a problem. And what we have is it's small pieces piled on top of each other, but we're supposed to read these complaints holistically. That's what the Supreme Court has told us. We have defendants that have advanced degrees in pharmacology. We have defendants that have spent years developing this drug. We have defendants that have approval authority over the aspects of how the drug is going to be manufactured. They had to sign off on the program documents Lori had prepared that would say what the steps would be in the manufacturing process. We have defendants that got every batch record from every unit of drug that Lori prepared. We have defendants that sold stock after receiving batch records indicating there was an investigation. I think if you put the pieces together, it's there, especially when we learn that what the FDA is concerned about is specifications. It's identity, strength, quality, and purity. And that's what we learned in August the 19th when they announced what the actual comments were from the FDA about their response to the approvable letter. What was the timing here of the, if you take the conference call, I guess there were a couple conference calls, but focusing on the sales of stock, which does seem to argue pretty strongly in your favor, but if you put that into the chronology in terms of the conference call, the press release, the approvable letter, where in that chain of events did the sales of stock occur? Sales of stock occur very early. And there's some criticism by the defendant that it's too early. It's almost two years, isn't it? It is. It's not a traditional pump and dump case, however, Your Honor. They're relying on a case such as Party City. Now, to my knowledge, and perhaps there's a case that says otherwise, this court has never adopted a temporal scope rule, that in other words, if the sales are too early, that that can't be fraud. Some frauds have a longer shelf life than others. One point, Enron was considered the most prominent company in America and was lauded by business reviews and then a few years later we learned out it was a fraud. Well, but it has to be knowledge at a certain point in time that gives rise to a sale. Absolutely. And what we're suggesting is that when they got a report back that there'd been an overage on the floor on the ground at Tatawa, that there was an excess of an active ingredient and that it wasn't investigated promptly as CGMP requires. And then two weeks later, Dr. Capitola starts selling stock in large blocks. Not small blocks, large blocks, at a time when all the company's public disclosures are positive. They've just announced successful phase three clinical trials. They announced that they're on track to make their NDA final. But all the things are true that they announced. The fact that they did successful trials is true, yes. There's an issue with respect to the trials in conjunction with Europe, but in terms of the FDA, they designed those with the FDA. But what is it that he knew that he didn't disclose on the basis for his sales? I mean, if all these things are all true- He knew that there were problems on the ground at Tatawa. Didn't everybody? No. Everybody didn't know until they got the form 483 disclosed in February the 1st of 2005. And that form, again, puts into place their process. If you look at what happened later, too, they get a second approvable letter in April of 06. And what does that tell them to do? It means, again, that they need to further tighten up their active ingredient and drug product specifications. Those are the same specifications that go to the same four words that Ms. McCaffrey wrote on the form, identity, strength, purity, quality. And then what happens? They have the stability failure in April 2006. And as you read through what they say about remediating that failure through June, July, and September, I think it becomes crystal clear that there was a change in the process. In June of 2006, they announced that their investigation into stability failure allowed them to address issues associated with this second approval letter. Again, relating to drug specifications, identity, strength, quality, purity. In July of 2006, Dr. Capitol has a meeting with analysts. What does he say? He tells the analysts, we've now run two investigational batches. We've addressed some of our chemistry manufacturing controls issues, our drug specification issues, as part of that process. And we've done these remediation measures. How have we done them? They were performed with reference to the surfaxin manufacturing process that produced the drug that was used in our highly successful phase three trial. So consistent with what Ms. McCaffrey wrote on the form, there is a change that has been effectuated in the process. And what I would submit to you with respect to the first part of the class period here is that given the importance of this contract to this company, that we're dealing with their core affairs, given the background of the defendants and their knowledge of this drug, which they've been developing for years, given the sign-off authority they had on the product specifications that this manufacturer was going to use, that that's enough. Well, at any point in time, because we have the subsequent, I guess it's a statement, some of these are press releases or conference calls, where there was a statement made, this is on, I guess, on February 1 of the conference call, on February 1, 2005. We remain confident that surfaxin will be approved, continue to work closely with FDA. Based on the information we now have in hand, we anticipate the launch of surfaxin will be delayed from the end of the first, second quarter, which we informed you to perhaps the beginning of the fourth quarter, and why we believe that, and they wanted to explain the reason for the delay. Now, that's fairly optimistic, but woven within that is the fact that there's going to be a delay. Is there anything in that statement, and I picked that one out not for any particular reason, but it seemed to be consistent with what you're alleging, that there's this rosy gloss put on information, buried within that, there may be a grain of truth from what they're saying, but the way that it's communicated is going to make the reasonable investigator, it was going to mislead the reasonable investigator. And we've alleged specifically that it did, because we allege that a Jannie Montgomery came out with a positive analyst report in response to their statements in that release, their statements in the subsequent analyst conference, and said that the market reaction to the 483 was overblown. I see my time is up. Yeah, I think you saved some time. Any final thoughts, David? Thank you. Thank you. May it please the court. You've gotten a little grayer, and you've lost a little bit of hair since the last time we saw you.           I'm a lawyer. I'm a lawyer. I'm a lawyer. I'm a lawyer. I'm a lawyer. I'm a lawyer. I'm a lawyer. You look a little admissible. Yeah, just a morbid little. Okay. Robert Hickock on behalf of the ATHLE's defendant in the case. As Judge Dalzell noted in two very thorough opinions, this has always been a case that has never had a coherent theory of liability. The premise of the case apparently is that starting sometime in early 2004, the defendants knew that this entire venture was doomed to failure, but continued it for multiple periods of time. And it just defies common sense. It's not a cogent inference of scienter under tell labs, and it's certainly not a compelling inference as strong as the inference that this company promptly and properly disclosed events as they occurred. If I may, Your Honor, let me start with the issue of information prior to the form 483 in January of 2005. The plaintiffs alleged, and it's purely a hindsight allegation, that the company should have known and should have disclosed that Laureate was not current good manufacturing practices compliant prior to January of 2005. Judge Dalzell found that that allegation, that contention was patently false. That's his phrase, because there's simply no pleaded facts to show that these defendants had any information suggesting significant problems at Laureate prior to January 2005. What we do know is that Laureate is a, it's a subsidiary of the New York Stock Exchange Company. It's a contract manufacturer for a number of pharmaceutical companies. It manufactures medicines for a number of companies in its facilities. And there's no reason for the defendants here to question the Laureate's capabilities to produce Surfaxan in accordance with current good manufacturing practices. They announced the transfer to Laureate in the summer of 2003. They signed the technology transfer and manufacturing agreement in October of 2003. And then the first batches were manufactured by Laureate in November of 2003. And it's true that one of those batches had an overage. But let's look at it in context. It's immediately when they started manufacturing, it's one batch out of many that was manufactured. Out of how many? I'm sorry? What did you say? One batch out of many? Out of how many? Your Honor, I don't have the exact numbers. I don't believe it's in the record. But the record supports that there were multiple batches manufactured, both for use in additional clinical trials beyond the phase three trials that were so successful, as well as process validation batches. So there were clearly multiple batches manufactured. There's only an overage in one that's identified. There's no pleading to show that anybody at Discovery Labs was even aware of that or that they should be. We've cited the Alpha Pharma case to suggest that there's no reason to think that senior officers of a company would be following detailed information about manufacturing, certainly as to one batch that was manufactured early on in the process. The plaintiffs tried to point to these variable prepaid forward contracts that were entered into. They were stock sales that were not unusual in scope or timing under this court's precedent in Warren v. Stafford. In the case of Capitola, it was maybe half of his shares. In the case of Shaver, it was about a third of his shares. And then in March of 2005, as Your Honor noted, there were purchases by these defendants. And they were not minimal purchases. Capitola purchased 35,000 shares. Shaver purchased 15,000 shares. Under this court's precedent, those purchases themselves negate any inference of scienter. We have cited the Party Cities case for the proposition that the sales were very early on in the process, and it's not tied to any information. Mr. Mishel is arguing, it's not a bad argument, that if you sell 100 times X based upon concerns about your company, and then you do some spinning in the interim to not allow the reasonable investor to realize what's going on in the manufacturing process, and then having sold 100 times X, you buy back 10 times X to kind of, it's like the bad fish that you throw to put the dog off the sun, that repurchase is not all that significant in the overall context. That's what he's arguing. It's not a bad argument. Well, Your Honor, I would say that the new buys here were non-trivial in quantity. The sales did not meet the Oren versus Stafford standard to, in and of themselves, give rise to scienter. And there's no tying up of those sales to any other information. As the district court found, there's simply no facts pleaded to show that these defendants had information about problems at Laureate prior to the issuance of the Form 483. Then let's talk about that for a minute. The Form 483 is issued to Laureate in January of 2005. Laureate then informs Discovery Labs of the Form 483. Discovery Labs issues a press release and holds a analyst conference call on February 1st, 2005, to review in detail what was covered in that Form 483. And Discovery Labs says in its press release, the Form 483 found that there were basic issues with respect to quality assurance, quality control, process assurance, and documentation. They said in the press release and conference call that this will delay the commercialization of surfaxin for at least six months and that it could result in the issuance of a not-approvable letter. It's clear that they were making a disclosure that was very significant in terms of the adverse impact that the Form 483 would have on the company, and the market perceived it entirely in that way. When that information came out, the shares of the stock fell by over 22%. And Judge Dalzell looked at those disclosures, looked at the Form 483, and said that the entirely in a manner consistent with the way the FDA was reading the Form 483, and he said that it's not permissible to find the company liable for reading the Form 483 in the same manner that the FDA was reading the Form 483. But then they went on to say, and I think this is in the conference call following the 483, they summed up by saying, let me assure you that these observations in the 483 do not implicate any fundamental flaws in the actual surfaxin production process itself, the manufacturing equipment, or the integrity of surfaxin used in the clinical trial. Is that an accurate statement, that it doesn't implicate the manufacturing process itself, any fundamental flaw in the manufacturing process itself? It is, Your Honor, and that's shown by a number of different points. The FDA in its own manuals and regulations, which we've cited, is very focused on documentation, and the criticism here was failure to have complete documentation. What we do know as a matter of public record is that Laureate was, in fact, manufacturing the drug, so there's no question the manufacturing was taking place. The plaintiffs acknowledged, it's on page 34 of their brief, that there was a transfer of a representative batch record from ACORN to Laureate, and that's the record report as to how to manufacture the drug, so there's no question, and they try to make a distinction between a master batch record and a representative batch record. A representative batch record is simply the master batch record populated by data. It's the same thing, so we know there was manufacturing. We know there was some documentation of it. Even plaintiffs agree with that. We know that the inspection report criticized the documentation, but we also know, Your Honor, and this is a very important point, the plaintiffs tried to distort the Form 483 to say it meant that what was being made was adulterated. That's simply not accurate. If it were an adulterated product, the FDA, by its own regulations, would have to shut down the facility and issue a not-approvable letter. We know that by mid-February of 2005, the FDA, in fact, issued an approvable letter, and that's one of the things that Judge Dalzell looked at in saying that the company was reading the Form 483 in a similar way to the FDA's reading of the Form 483, and that's simply not actionable. Excuse me, one easy way to get around this is when you have a press release, maybe the press will never pick it up, but just send out the 483. It's a public document, isn't it? Your Honor, it became a public document. It was not public at the time of the issuance of the press release. It was later posted by the FDA on its website, and so it became a public document in 2006, and that's, from our point of view, the plaintiffs picked it up and then tried to plead a hindsight case based on the Form 483. But I believe what the company tried to do was accurately describe the categories of the Form 483, the points that were covered in it, and there's certainly precedent to say that it's inappropriate to inundate markets with information. And so, you know, you could attach all of the FDA regs, you could attach the Form 483, you could attach other documentation, and so I think that's an issue there. Your Honor, unless there were any further questions, I think I addressed the issues that... Would you comment on the MAA, the European regulators aspect? Yes, Your Honor. I think there is a problem you picked up with respect to the Cienter issue that hasn't been appealed. Your colleague didn't mention it. Maybe he's not really pushing that issue. Your Honor, I agree. We don't believe that they have preserved their appeal with respect to the district court's finding of no Cienter as to the marketing application to the EMEA. In addition, we don't believe that that information was at all material. And let me just comment on that briefly. The EMEA, the European process, is different than the FDA process. In the year 2000, just as the company was getting started, it had some preliminary meetings with EMEA where EMEA gave non-binding advice saying, well, when you get to the point of doing phase three trials, you might consider looking at this. And it asked, in particular, for a comparison with an animal surfactant that was being used in Europe. By 2003, when the company was in a position to do its clinical trials, obviously its primary constituency was the FDA. The FDA process is different. The FDA tells you you're going to do it this way, and if you don't, you have no chance of getting FDA approval. The company obviously agreed to follow the FDA's request in terms of the way the trials were structured. The select trial, in fact, did do a comparison against Cervanta, the animal product, but not a direct head-to-head comparison, as EMEA suggested. But the difference is we're now talking about 2003 in mandated trials by the FDA, as opposed to the year 2000, very preliminary in this process, and the advice being non-binding, both on behalf of the EMEA and the company. And the company, by 2003, had every reason to believe that the trials it did would be accepted by the EMEA. The results were tremendous. This product is going to save a lot of lives. The mortality rates were half what they were with the animal surfactants. The EMEA agreed to recommend, and the European Commission accepted this as an orphan medicinal product in 2004, and the standards for doing that are only if it shows a very strong comparison to currently existing medicines. At the same time, in 2005, the FDA and the EMEA were announcing their harmonization program to not make people do a variety of different things and to have some consistency in the clinical trial process. So not only is there no showing of scienter with respect to that information, there's no showing of scienter. We don't believe the issue has been properly preserved for appeal, and the information was clearly not material in terms of the difference between very early preliminary advice and the later mandated trials by the FDA. Thank you, Your Honor. Thank you. This is a very different case from Alfarma. I'm sorry. This is a very different case from Alfarma. Alfarma involved a Brazilian subsidiary that contributed 1% to the revenue of the relevant company. This is a case that's focused upon a single plant, which is going to be the sole source of this company's revenue, and the suggestion that the defendants don't have a reason to monitor or know what's going on in that plant simply is not supported by the record. The record shows that under the contract, they got a copy of every batch record. They've had problems with their prior contract manufacturer. They have advanced degrees in pharmacology. Well, but it's interesting that you have a batch record there. This is a one-product company. I think you're arguing, given the fact it's a one-product company, it's not that they were monitored. It's not like the folks at Merck or Smith and Klein or any of those kinds of pharma operations. This is a single-product company, and if you get a batch record in, the natural inference would be that you're going to sit down and very closely scrutinize what is happening to your product, because it's the only product you have. But nevertheless, there's still this entry requirement that is perked up through the change that Congress made in the legislation, and is that enough to simply say, well, you can infer that once they get the batch record. If there's something in the batch record that would suggest to the reasonable investor that they need to know that information, these folks knew it and didn't disclose it. Is that enough of an inference? Let's first talk about the inference that they read the batch records. Under the contract, and this is at Joint Appendix page 193, the time to accept or reject goods produced under this contract for each batch is driven by receipt of the batch record. So you can infer from that there's a very good reason to review the batch records. It's just an aside. Well, what did the review have shown? Would it have shown them that one batch in the overall testing batches failed? It was a problem with one batch? It would show them that. It would also show them that there were difficulties with following the instructions that have been approved in place because of the overage. It would enable them to go back and compare them with the process that they used in the past as well. And remember that these are people that have advanced degrees in pharmacology. It's not a lawyer. It's not an accountant. Also, you have the sales. Now, the level of sales in Supremo was 38 percent, and depending on how you count the shares here, we're either very close to that or we're over. In our view, you should exclude the options. And you should exclude the options for the simple reason that they can't transfer their options. They have to hold them. We covered this in our reply brief. With respect to the shares that they own, Dr. Capitola sold between 65 and 87 percent of the shares he could sell. Dr. Schaber sold between 82 and 99 percent of the shares he could sell. And— Embark backward percentage. Minute in comparison. We're talking about hundreds of thousands of shares. I think in Dr. Capitola's case, his first contract covered something like 500,000 shares. Can I back up a minute to the center? You pointed me earlier to Advanta and there, the distinction between the anchor communications. There, there was extrinsic evidence, such as discussions among the officers regarding product incompatibility. Do we have anything here other than the fact that they knew or that they realized—excuse me, strike that—that they received the batch results? To show that they must have understood there was a problem. Is there anything here other than the fact that they received them? Well, you have the fact that they had the front-end structure. In other words, that they had the whole process of, you know, how is Laureate going to improve this, make this medication? There was a program document that was going to be drafted by Laureate. That had to be reviewed and approved by Discovery Labs, which has the background knowledge of having dealt for years with the production of this drug under Acorn and under Dr. Schaber's We have nothing other than the fact that they received the records. We have no conversations. And we not only need to know they read them, but also they understood them and knew there was a problem. Don't we have to have something that adds the anchor that does that? I think the sales does a really good job of that. Two weeks after the investigation of the overage, we had Dr. Capitola suddenly unloading millions of dollars of stock at a time when everything looks wonderful for this company. And in the next few weeks, he sells more. And then shortly before, the new drug application is filed. What was the stock price at that time? It was in the teens. It was like around $12 a share when he sold it. And we went through the structure of these contracts, and they were unusual in the sense that they're set up in a fashion that the more you get up front, the more of your upside potential you bargain away. And both of these gentlemen structured their contracts in a way which basically gave away their upside protection, that they maximized their production from a drop in the stock price at a time when they're making optimistic statements, and at a time when they have the batch record that says, we had an overage. I think that's enough. I guess the question is whether it's speculation or proper inference. I believe it's a proper inference, given the fact that you're dealing with the core operations. If you have a moment, I wonder if I could touch upon AMIA very briefly. Well, it has been up for a bit. And Mr. Hickok, by his own, I guess, discipline, corralled himself within the red lights. If there's something you want to add to it, why don't you do a 28-J letter and give opposing counsel a copy of it. That's fine. Thank you very much for your time. Thank you very much. And we'll take the matter into advisory. Thank you also very much for a very helpful argument and briefing.